UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

|  |  |
|---|---|
| BONNIE AKERSON, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 12-10240-PBS |
| | ) |
| PENNY PRITZKER | ) |
| *Secretary of Commerce*, and | ) |
| U.S. DEPARTMENT OF COMMERCE, | ) |
| | ) |
| Defendant. | ) |

---

Saris, U.S.D.J.

## MEMORANDUM AND ORDER

November 4, 2013

## I. INTRODUCTION

Plaintiff Bonnie Akerson brings this action alleging that her former employer, the United States Census Bureau, terminated her employment because she is Caucasian and disabled, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000, and the Rehabilitation Act of 1973, 29 U.S.C. § 701. She contends that she was terminated in retaliation for requesting reasonable accommodations for her disability, and that she was paid less than a similarly qualified male employee in violation of the Equal Pay Act, 29 U.S.C. § 206. Defendant moves for

1

summary judgment on all claims. The Court heard oral argument on
the motion for summary judgment on July 29, 2013. After a review
of the record, the Court **DENIES** Defendant's Motion for Summary
Judgment on Plaintiff's claims of disability discrimination and
retaliation but otherwise **ALLOWS** the motion. (Docket 23).

## II. STATEMENT OF UNDISPUTED FACTS

When all reasonable inferences are drawn in Plaintiff's
favor, the record contains the following facts, which are
undisputed except where noted.

### *1. Employment at the Census Bureau*

In February 2008, the Bureau of the Census posted a
recruiting bulletin for Partnership Specialist openings in the
Boston regional office. Partnership Specialists were eligible for
pay at four salary grade levels, GS-7, GS-9, GS-11, and GS-12.
Applicants could apply to the position at one or more of the four
grade levels, depending on their education and experience. The
bulletin stated that applicants "[m]ust submit a separate
completed Application for each grade level applied." Under "**HOW
TO APPLY**," the posting provided the following instructions:

> Each applicant must submit a complete application for ***each***
> grade level they wish to apply for, using the Optional
> Application for Federal Employment (OF-612), or a resume,
> listing your work duties and accomplishments relating to the
> job for which you are applying. If only one application is
> received, you will be considered only for the lowest grade.

2

(emphasis in original).

Plaintiff, a Caucasian female, applied only for the Partnership Specialist position at the GS-9 pay grade. She did not apply for the other three grade levels.

Partnership Specialists were responsible for educating external organizations about the upcoming 2010 Census and encouraging them to enter into "partnership agreements" with the Census Bureau. By signing a partnership agreement, an organization agreed to dedicate its time and resources to promoting the 2010 Census. The 2010 Census Partnership Agreement Form lists twenty-six ways in which a "partner" can support the Bureau's efforts. Each partner could commit to one or more of these projects (referred to as "commitments") by checking the appropriate boxes on the agreement form. Def. Mem. in Supp., Ex. B (Docket 26).

Plaintiff began working as a Partnership Specialist (GS-9) on May 12, 2008. Defendant paid Plaintiff at the GS-9 salary level. Carlos Linera, Plaintiff's male colleague, applied for the Partnership Specialist position at the GS-11 pay grade, and he was paid at the higher level. The Partnership Specialist positions at the GS-9 and GS-11 levels involved substantially the same responsibilities. At the time of Plaintiff's employment, at least one female Partnership Specialist was paid at the GS-11

salary level. EEOC Hr'g Tr. at 311 (Kalaitzidis Test.) (Docket 42, Ex. A).

Plaintiff had two supervisors at different points during her employment: Cesar Monzon, a Hispanic male, and Ana Maria Garcia, a Hispanic female. Monzon interviewed, hired and then supervised Plaintiff from her initial hiring date until December 23, 2008, when Garcia became her new supervisor. At all times during Plaintiff's employment, Kathleen Ludgate, a Caucasian female, was the Director of the Boston Regional Census Office.

### *2. Bladder Disease*

Plaintiff has suffered from an inflammatory bladder disease known as interstitial cystitis for approximately five years. The condition is exacerbated by stress, causing "flare-ups" during which her symptoms are more severe. When her condition is exacerbated, Plaintiff must use the restroom frequently, as often as every twenty minutes, although each visit typically lasts no longer than the restroom visits of a healthy individual. During flare-ups, she experiences a feeling of persistent "fullness" in her bladder, constant pressure and pain, and difficulty sleeping. Neither Monzon nor Ludgate was ever aware of Plaintiff's illness. However, Garcia became aware of Plaintiff's bladder condition and need for frequent restroom breaks on February 9, 2009.

The following facts are largely disputed. Plaintiff asserts that Monzon would intentionally call her on the phone when she

4

was in the restroom, although he could see her desk from his
workspace. When she did not answer her phone, Monzon would send a
co-worker into the bathroom after Plaintiff, and then "shake his
head disapprovingly" when Plaintiff returned from the bathroom.

Monzon denies that he asked employees to seek out Plaintiff
in the bathroom. He admits that he repeatedly inquired about
Plaintiff's whereabouts, but claims that he did so because on
several occasions she was away from her desk for extended periods
of time without explanation. Def. Mem. in Supp., Ex. D (Docket
26). Monzon did not recommend her for disciplinary action based
on unexplained absences. Plaintiff's October 2008 performance
evaluation does not reference absences from the office.

### *3. Work Performance*

In October of 2008, Plaintiff received a performance
evaluation conducted by Monzon. On a scale of one (unacceptable
performance) to five (highest level of performance), Plaintiff
received a rating of "three" (acceptable performance) in all four
evaluated categories. However, she received criticisms in two
areas. Monzon's review stated that Plaintiff needed to execute
more timely follow-up with external partners and establish a time
line for one of her projects.

On or about November 3, 2008, Plaintiff's office instituted
a policy that all Partnership Specialists were to submit a
minimum of ten signed partnership agreements per week. Laura

Medrano, a Hispanic Partnership Specialist, testified as to her understanding that she could meet the quota by obtaining ten total commitments (for example, by submitting two partnership agreement forms, each with five commitments checked off on the form). EEOC Hr'g Tr. at 303-4 (Medrano Test.) (Docket 34, Ex. 1). Monzon testified that the requirement was ten *agreements* per week, as communicated to Specialists at two November meetings. EEOC Hr'g Tr. at 236-38 (Monzon Test.) (Docket 26, Ex. A).

During the next three months, Plaintiff was counseled by her supervisors at least six times regarding her failure to meet the partnership agreement quota. On November 26, 2008, Monzon spoke with Plaintiff about her low numbers. He also expressed concern that she had not yet submitted a partnership agreement resulting from a business trip to Burlington, Vermont. Plaintiff entered the agreement from her Vermont trip into the database approximately one month after this conversation.

On December 5, 2008, Monzon met with Plaintiff to discuss her failure to obtain ten signed agreements per week. In an e-mail dated December 18, 2008, Monzon wrote, "your number[s] have to increase." Def. Mem. in Supp., Ex. J (Docket 26). On January 5, 2009, Plaintiff was counseled about problems meeting her quota on a telephone call with Monzon and Garcia and in an email from Garcia the following day.

In late January of 2009, Plaintiff twice met with Garcia regarding her work performance and partnership agreements. Plaintiff described the meetings as "heated" and "serious" and believed her job might be in jeopardy. EEOC Hr'g Tr. at 101 (Pl. Test.) (Docket 26, Ex. A). During one of these meetings, Garcia stated that Plaintiff was on probation. At the last of these meetings, on January 23, 2009, Garcia discussed with Plaintiff the fact that she had submitted only seven partnership agreements for the week, none of which contained original signatures and two of which were dated from October of the previous year.

In addition to the ongoing criticism of Plaintiff's performance with respect to partnership agreements, five other incidents bear on Plaintiff's work performance and interactions with colleagues. On December 29-30, 2009, Plaintiff and Monzon exchanged a series of emails regarding "Hudson College," only later discovering each was referring to a different "Hudson College." Def. Mem. in Supp., Ex. L (Docket 26). Plaintiff felt that Monzon's emailed reply constituted an unfair criticism. On January 5, 2009, Plaintiff sent an email listing one of her upcoming meetings as "Tufts Dental," but was not explicit with her supervisors that it was a personal medical appointment and

not a business meeting, which caused confusion.[1] Def. Mem. in
Supp., Ex. M (Docket 26).

Conflict arose between Plaintiff and Ludgate, who is also
Caucasian. At one point, Plaintiff claims that Ludgate yelled at
her and criticized her for being late to leave for a trip to
Rhode Island with another Partnership Specialist, who is African-
American. Plaintiff avers that Ludgate did not similarly
reprimand the other Partnership Specialist, who was equally
responsible for the miscommunication. Ludgate denies that she
yelled at Plaintiff and claims that she also spoke to the other
Partnership Specialist about time management concerns. Def. Mem.
in Supp., Ex. I (Docket 26).

On January 14, 2009, Ludgate criticized Plaintiff's
preparation for a meeting with the Boston Chamber of Commerce
that day. Ludgate expressed irritation that Plaintiff had not
printed directions to the meeting location before they left the

---

[1]  The email lists two "Meetings this week," one with the United
Auto Workers and one with Tufts Dental. Before leaving for a
personal dental appointment on January 6, 2009, Plaintiff left a
medical leave slip on Monzon's chair. At this point, Garcia
supervised Plaintiff, not Monzon. Defendant's Sick Leave Policy
states that employees with scheduled medical appointments must
"notify your supervisor as far in advance as possible" and
prepare a Request for Leave or Approved Absence form for
supervisor approval. Def. Mem. in Supp., Ex. N (Docket 26).
Plaintiff did not submit documentation of her appointment in
advance. On January 6, 2009, Garcia emailed Plaintiff, stating
that she was "confused" by Plaintiff's January 5, 2009 email
about the two scheduled meetings. Def. Mem. in Supp., Ex. M
(Docket 26).

Census office. When Plaintiff and Ludgate arrived at the Boston
Chamber of Commerce, Chamber representatives said that they were
unprepared for the meeting because they did not have it on the
schedule. Plaintiff had booked the meeting months before but had
not confirmed it. Ludgate reported this incident to both Garcia
and Monzon.

Finally, on January 20, 2009, Plaintiff sent an email to
Garcia and Monzon inquiring about the tax implications of college
student residency. Monzon referred Plaintiff to a manual
regarding residence rules. He and Garcia later criticized
Plaintiff because they believed she ought to have known the
answer.

## 4. Leave of Absence and Termination

In late January of 2009, Plaintiff's bladder condition
worsened. On January 26, 2009, she began an unexpected two-week
leave of absence recommended by her urologist. Upon returning to
work on February 9, 2009, Plaintiff met with Garcia and a Human
Resources representative. Plaintiff's purpose in requesting the
meeting was to discuss her medical leave and inform her
supervisor of her bladder condition. She submitted two notes from
her doctor indicating she could return to work "without
restriction." Def. Mem. in Supp., Ex. P (Docket 26). During the
meeting, Garcia asked Plaintiff how long she would need to be in
the bathroom on any given visit, which Plaintiff found

humiliating. Garcia also asked Plaintiff to let her know about her whereabouts whenever she was away from her desk for reasons other than using the restroom. Plaintiff alleges that other employees were not similarly required to inform Garcia about their whereabouts when away from their desks.

Furthermore, upon her return, Plaintiff found her desk had been moved to a different location, and her duties had been reassigned. She was instructed to train co-workers on a software program, rather than continue working on the Colleges and Universities Initiative as she had prior to her leave. On February 12, 2009, Defendant sent a termination letter to Plaintiff. Def. Mem. in Supp., Ex. E (Docket 26).

Defendant asserts that the decision to terminate Plaintiff came in January of 2009, before her medical leave of absence began on January 26. Monzon testified that he recommended Plaintiff's termination around January 13. EEOC Hr'g Tr. at 254, 281-82 (Monzon Test.) (Docket 26, Ex. A). Garcia testified that she recommended Plaintiff's termination to her supervisor around January 23, with a tentative termination date of January 30. EEOC Hr'g Tr. at 350 (Garcia Test.) (Docket 26, Ex. A). Defendant did not provide documentation to support this testimony about the timing of the decision. Although Garcia and Monzon both testify that their recommendations went to the Boston Regional Office's coordinator of administration, it is not clear who from

"headquarters" ultimately approved Plaintiff's termination. <u>Id.</u> at 349-50; EEOC Hr'g Tr. at 254 (Monzon Test.) (Docket 26, Ex. A). Monzon signed the termination letter.

During Garcia's tenure at the Census Bureau, she supervised two other Partnership Specialists who were terminated, a Caucasian male for insubordination and an African-American female for performance issues. <u>Id.</u> at 350-51.

### III. ANALYSIS

**A. *Standard of Review***

Summary judgment is appropriate when there is "no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To succeed on a motion for summary judgment, the moving party must demonstrate that there is an "absence of evidence supporting the non-moving party's case." <u>Sands v. Ridefilm Corp.</u>, 212 F.3d 657, 660 (1st Cir. 2001) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)).

The burden then shifts to the non-moving party to set forth specific facts showing that there is a genuine issue of material fact for trial. <u>Quinones v. Houser Buick</u>, 436 F.3d 284, 289 (1st Cir. 2006). A genuine issue exists where the evidence is "sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." <u>Nat'l Amusements, Inc. v. Town of Dedham</u>, 43 F.3d 731, 735 (1st Cir. 1995), <u>cert.</u>

<u>denied</u>, 515 U.S. 1103 (1995). A material fact is "one that has the potential of affecting the outcome of the case." <u>Calero-Cerezo v. U.S. Dep't of Justice</u>, 355 F.3d 6, 19 (1st Cir. 2004). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986) (internal citations omitted). In its review of this evidence, the Court must examine the facts in the light most favorable to the nonmoving party – here, Plaintiff – and draw all reasonable inferences in her favor. <u>Sands</u>, 212 F.3d at 661. "In the final analysis, . . . [the Court] is required to determine if 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" <u>Id.</u> (citing <u>Anderson</u>, 447 U.S. at 249).

**B.  *Race Discrimination***

Title VII prohibits employment discrimination on the basis of race. 42 U.S.C § 2000e-2(a)(1). Plaintiff alleges that the Defendant violated Title VII by subjecting her to disparate treatment because she is Caucasian. The Court analyzes this claim under the familiar <u>McDonnell Douglas</u> burden-shifting framework. <u>Bhatti v. Trustees of Boston Univ.</u>, 659 F.3d 64, 70 (1st Cir. 2011) (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973)). First, a plaintiff must mount a prima facie claim of race discrimination. <u>Bhatti</u>, 659 F.3d at 70. The burden shifts to the employer to rebut the plaintiff's claim by offering a

legitimate, non-discriminatory basis for its employment decision. Id. The burden then returns to the plaintiff to show that the reasons offered are mere pretext, and the real basis for the adverse action was her race. Id.

### 1. Plaintiff's Prima Facie Case

To establish a prima facie case of racial discrimination based on disparate treatment, a plaintiff must show that (1) she belongs to a protected class; (2) her job performance met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) there is some evidence of a causal connection between her membership in a protected class and the adverse employment action. Cham v. Station Operators, Inc., 685 F.3d 87, 93-94 (1st Cir. 2012); Bhatti, 659 F.3d at 70. Plaintiff is Caucasian. The Supreme Court has held that because the language of Title VII is "not limited to discrimination against members of any particular race", the statute prohibits racial discrimination against Caucasian employees "upon the same standards as would be applicable" to non-white employees. McDonald v. Santa Fe Transp. Co., 427 U.S. 273, 278-80 (1976).[2]

---

[2] Effectively, the McDonald Court concluded that all individuals are members of a protected class for purposes of Title VII racial discrimination cases, making the first prong of the prima facie case a nullity. The Seventh Circuit has dropped this prong in cases with white petitioners, replacing it with a stricter requirement that the plaintiff show "background circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against whites or evidence that there is something fishy about the facts at hand."

Plaintiff's supervisors gave her a rating of "three" in all categories of her October 2008 evaluation, indicating a satisfactory level of performance. <u>Cf.</u> <u>Douglas v. J.C. Penney Co.</u>, 442 F. Supp. 2d 260, 273 (D. Mass. 2006), <u>aff'd</u>, 474 F.3d 10 (1st Cir. 2007) (although the plaintiff's performance reviews "were not without criticism, for the most part they describe a level of job performance that is, at a minimum, satisfactory").

With the first two prongs met, the Court turns to the third. An employment action is adverse if it materially alters the conditions of the workplace and terms of the employment. <u>Cham</u>, 685 F.3d at 94. Plaintiff alleges that she suffered five adverse actions on account of her race: (1) Monzon's behavior towards her when she used the restroom; (2) the exchange between Monzon, Garcia, and Plaintiff regarding Plaintiff's January 20, 2009 email inquiring about census rules regarding college student residency; (3) Ludgate's response to the miscommunication between Plaintiff and her co-worker regarding meeting time and location for their Rhode Island trip; (4) Ludgate's criticism of Plaintiff's preparation for the Boston Chamber of Commerce meeting; and (5) Plaintiff's termination.

---

<u>Henry v. Jones</u>, 507 F.3d 558, 564 (7th Cir. 2007) (internal quotations omitted). The First Circuit has thus far retained the traditional prima facie framework.

When the challenged actions are examined from the objective perspective of a reasonable employee, each of the first four incidents does not rise to the level of an adverse action. <u>See</u> <u>Billings v. Town of Grafton</u>, 515 F.3d 39, 54 (1st Cir. 2008). To be adverse, an employment action must be more than an objectionable exchange, however much an incident might displease the employee or cause legitimate hurt feelings. <u>Morales-</u> <u>Vallellanes v. Potter</u>, 605 F.3d 27, 35 (1st Cir. 2010), <u>cert.</u> <u>denied</u>, 131 S. Ct. 978 (2011). An adverse action "typically involves discrete changes in the terms of employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." <u>Id.</u> (internal quotation omitted).

Beginning with the first challenged action, Mr. Monzon's alleged conduct did not materially alter the terms of her employment. The second incident surrounding Plaintiff's email inquiry, as viewed from the standpoint of a reasonable employee, did not rise to the level of an adverse action. Monzon's response email offered a straightforward answer to Plaintiff's question, and the subsequent critique from Monzon and Garcia was not disciplinary in nature. <u>Bhatti</u>, 659 F.3d at 73 (criticisms "merely directed at correcting" work performance do not rise to the level of adverse actions). As for the third and fourth

alleged adverse actions, verbal criticism, even if spoken in a
tone that pushes the bounds of professionalism, does not
constitute an adverse action when unaccompanied by any tangible
consequence. Id.; see also Lee-Crespo v. Schering-Plough Del
Caribe, Inc., 354 F.3d 34, 47 (1st Cir. 2003) (observing that "a
supervisor's unprofessional managerial approach and accompanying
efforts to assert her authority are not the focus of the
discrimination laws").

Plaintiff's termination qualifies as a textbook adverse
action, so the Court turns to the fourth step in the prima facie
analysis. Plaintiff does not explicitly describe how her
termination was causally connected to her race. Though she
asserts generally that she was treated more harshly than non-
Caucasian employees when she was terminated, she does not point
to evidence that would permit a reasonable jury to infer that her
termination had anything to do with being Caucasian. While the
timing of the termination may have been fishy (more on that
later), there is nothing about the termination which suggests
race (as opposed to a disability-related matter). The only
instance in which she asserts she was treated more harshly
involved a situation where she felt she was unfairly criticized
for being late to a meeting, but an equally responsible African-
American colleague was not similarly criticized. Although a
plaintiff's burden to demonstrate a prima facie case "is not an

onerous one," Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003), vague assertions coupled with her account of this one incident, which is not even mentioned in the termination letter, are not sufficient.

### 2. Agency's Proferred Legitimate, Non-Discriminatory Reason for Dismissal and Pretext for Discrimination

Even if the Court assumes that Plaintiff has made out a prima facie case of discrimination, her claim fails under the second and third steps of the McDonnell Douglas burden-shifting regime. Plaintiff does not dispute that Defendant has articulated a lawful, non-discriminatory reason for Plaintiff's termination: her poor performance, as described in her termination letter. See Def. Mem. in Supp., Ex. E (Docket 26).

At the third step of the analysis, the burden shifts back to Plaintiff to show that the Agency's proffered reason is "a coverup" for discrimination. McDonnell Douglas, 411 U.S. at 805. Pretext can be shown through evidence highlighting "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's reasons. Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000). Plaintiff argues that her termination letter contains five deficiencies, and thus the real reason for her termination was her race. Because her assertions also bear on the disability

discrimination analysis below, the Court comprehensively addresses each alleged deficiency here.

Plaintiff argues that the letter erroneously declares that she failed to improve on issues identified in her October 2008 performance review. The termination letter discusses the two areas of concern identified at this performance review: customer service and plan implementation. While the letter does not state that termination was about a failure to improve, it does focus on multiple performance deficiencies.

Plaintiff argues that the termination letter falsely states that she did not submit a partnership agreement form from her trip to Burlington, Vermont. Defendant agrees that the letter is incorrect, and Plaintiff did submitted a signed form from this trip. It is undisputed, though, that the completed form was not submitted until a month after Monzon reminded Plaintiff to submit it. Plaintiff does not dispute that Monzon also counseled her about "ineffective planning" for her trip.

Next, Plaintiff argues that the letter erroneously alleges that she misrepresented a personal appointment at Tufts Dental as a business meeting. The letter itself does not claim that Plaintiff intended to mislead her supervisors. Instead, it describes how Plaintiff's January 5, 2009 email confused her supervisors, and led Garcia to "inform[] [her] of the seriousness of providing erroneous information regarding business related

18

meetings" during their January 7, 2009 meeting. While Plaintiff may have felt that Garcia overreacted to a miscommunication, the email was confusing. Few of us would list a doctor's appointment as a "meeting this week."

Most significantly, Plaintiff objects to the termination letter's description of Plaintiff's supposed inability to meet her partnership agreement quota. During the fall of 2008, Defendant adopted the policy requiring each Partnership Specialist to complete a minimum of ten agreements each week. Plaintiff does not dispute that this expectation was communicated to all Partnership Specialists in the Boston office in early November 2008. Plaintiff points to evidence that Laura Medrano, a Hispanic Partnership Specialist, understood the policy as a requirement to obtain ten total *commitments* from partners, but Plaintiff does not offer evidence that Medrano's interpretation represented office policy. Indeed, Plaintiff herself testified that "everybody had to meet the quota." EEOC Hr'g Tr. at 106 (Pl. Test.) (Docket 26, Ex. A). It is undisputed that Plaintiff failed to meet this quota. She was counseled about this deficiency on at least six occasions between November 2008 and January 2009, and she repeatedly submitted partnership agreements with errors, such as missing original signatures and altered Partner commitments.

None of Plaintiff's assertions, even taken together, amount to a showing that the "true reason" for her termination is racial

discrimination. Santiago-Ramos, 217 F.3d at 54. While the termination letter contains one inaccuracy, the record at summary judgment supports the general thrust of the letter's stated reasons for her termination. Plaintiff offers little to no evidence that the termination itself was the result of racial bias. See Bhatti, 659 F.3d at 72. Plaintiff does not dispute that the only other Partnership Specialist supervised by Garcia who was terminated for poor performance was African-American. While not determinative, this negates Plaintiff's contention that she was treated differently than similarly-situated non-Caucasian employees when she was terminated on account of her job performance.

Accordingly, Defendant's Motion for Summary Judgment is **ALLOWED** with respect to Plaintiff's racial discrimination claim.

C. *Disability Discrimination*

The Rehabilitation Act, which applies to federal agencies, prohibits employment discrimination against a disabled person on the basis of her disability.[3] 29 U.S.C. § 794. For purposes of summary judgment, the Court reviews Plaintiff's claim under the

---

[3] Cases brought under the Americans with Disabilities Act of 1990 (ADA) and jurisprudence regarding that statute are also instructive for this Court's analysis, as liability standards are the same under the ADA and the Rehabilitation Act. See 29 U.S.C. § 791(g); see also Quiles-Quiles v. Henderson, 439 F.3d 1, 5 (1st Cir. 2006); Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d 6, 19 (1st Cir. 2004) ("[T]he caselaw construing the ADA generally pertains equally to claims under the Rehabilitation Act.").

<u>McDonnell Douglas</u> burden-shifting framework described above. <u>Rios-Jimenez v. Principi</u>, 520 F.3d 31, 40-41 (1st Cir. 2008).

### 1. Prima Facie Case

To put forth a prima facie showing of disability discrimination, a plaintiff must demonstrate that (1) she was disabled within the meaning of the Rehabilitation Act; (2) she was qualified to perform the essential functions of the job, either with or without a reasonable accommodation; and (3) the defendant took adverse action against her because of her disability. <u>Id.</u> at 41 (citing <u>Bailey v. Georgia-Pacific Corp.</u>, 306 F.3d 1162, 1166 (1st Cir. 2002)). Defendant disputes that Plaintiff is disabled as that term is defined by the Rehabilitation Act, and if she is, that she was terminated because of her disability.

Disability under the Rehabilitation Act may be established under the "actual disability prong" through a showing of a physical or mental impairment which substantially limits one or more major life activities. 28 U.S.C. § 12102(1); <u>Carreras v. Sajo, Garcia & Partners</u>, 596 F.3d 25, 33 (1st Cir. 2010). Under this definition, the Court examines (1) whether the plaintiff suffers from a mental or physical impairment; (2) whether the impairment limits a life activity that qualifies as major; and (3) whether the impairment substantially limits the major life

activity. <u>Carreras</u>, 596 F.3d at 32. "The burden is on the plaintiff to establish these three elements." <u>Id.</u>

The 2008 ADA Amendments Act ("ADAAA"), which contains a conformity provision for the Rehabilitation Act, provides guidance for courts assessing whether a plaintiff is disabled. <u>See</u> 42 U.S.C. § 12102. Under the amended ADA, "[t]he definition of disability . . . shall be construed in favor of broad coverage of individuals . . . to the maximum extent permitted by the [Amendments]." 42 U.S.C. § 12102(4)(A). Indeed, "the primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA." 29 C.F.R. § 1630.1(c)(4). An impairment is a disability within the meaning of the Rehabilitation Act if it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1).

The ADAAA took effect January 1, 2009 – just over a month before Plaintiff was terminated from her position. The ADAAA does not apply retroactively to conduct occurring before the Act took effect. <u>Thornton v. United Parcel Serv., Inc.</u>, 587 F.3d 27, 34 (1st Cir. 2009). Because the crux of Plaintiff's disability discrimination claim concerns conduct occurring after January 1, 2009 – including several meetings with her supervisors, her leave of absence, her request for accommodations, and her termination –

the Court will evaluate her disability discrimination claims with respect to the new ADA standards.

With that background, the Court returns to the three-part Carreras test, bearing in mind that courts "must determine the existence of a disability 'on a case-by-case basis.'" 596 F.3d at 33 (citing Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 566 (1999)). Plaintiff's condition satisfies the first prong of Carreras. The amended ADA now includes as a physical impairment "any physiological disorder or condition . . . affecting one or more body systems, such as . . . [the] digestive [and] genitourinary [systems]." 29 C.F.R. § 1630.2. Because Plaintiff's impairment affects her bladder, she has a physical impairment. Plaintiff satisfies the second Carreras prong because her alleged condition impairs her ability to work, a major life activity under the ADA. 42 U.S.C. § 12102(2)(A); Quiles-Quiles v. Henderson, 439 F.3d 1, 6 (1st Cir. 2006).

The third Carreras prong asks the Court to assess "the degree of limitation occasioned by [Plaintiff's] physical impairment." 596 F.3d at 33. Defendant challenges Plaintiff's contention that her ability to work is substantially limited because she frequently must use the bathroom. Defendant also points out that the flare-ups of the condition are limited in duration, can be controlled by medication, and that Plaintiff's doctor allowed her to return to work "without restrictions." When

23

her condition is exacerbated by stress, Plaintiff says she is required to use the restroom as often as every twenty minutes, with each visit lasting between five and ten minutes. Because Plaintiff testifies she experiences such disruption throughout her workday, a reasonable jury could find that she is substantially limited in her ability to work "as compared to most people in the general population." 29 C.F.R. §1630.2(j)(1). The Court concludes that this "fact-intensive and individualized" inquiry is best left to a jury. Carreras, 596 F.3d at 33 (internal quotation omitted).

Having concluded that a genuine issue of material fact exists as to whether Plaintiff is disabled, the Court briefly describes the second and third prongs of Plaintiff's prima facie case. As Defendant concedes, Plaintiff was qualified for her job. Her termination constitutes an adverse employment action.[4] The four-day interval between Plaintiff's disclosure of her disability and her termination "is sufficiently close temporal proximity to warrant a prima facie inference of a causal

---

[4] Plaintiff claims that she was subjected to other adverse employment actions because of her disability, including moving her desk after her leave of absence, taking her off the Colleges and Universities initiative, and reassigning her to train coworkers. As discussed supra, these events do not rise to the level of adverse employment actions under federal employment anti-discrimination law, either standing alone or considered cumulatively. Compare Morales-Vallellanes v. Potter, 605 F.3d 27, 35-40 (1st Cir. 2010), cert. denied, 131 S. Ct. 978 (2011), with Valentin-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 97 (1st Cir. 2006).

connection between the two." <u>Alvarado v. Donahoe</u>, 687 F.3d 453, 464 (1st Cir. 2012).

### 2. Agency's Proferred Legitimate, Non-Discriminatory Reason for Dismissal

As stated above, Defendant asserts that they discontinued Plaintiff's employment because of her poor performance, a lawful, non-discriminatory reason for termination.

### 3. Pretext for Discrimination and Discriminatory Animus

The Court turns to the question of discriminatory animus, asking whether a factfinder could "reasonably infer that unlawful discrimination was a determinative factor in the adverse employment action." <u>Feliciano de la Cruz v. El Conquistador Resort & Country Club</u>, 218 F.3d 1, 6 (1st Cir. 2000). Plaintiff presents evidence that Monzon would ask coworkers to follow Plaintiff to the restroom and "shake his head disapprovingly" when she returned. Moreover, the temporal proximity between Plaintiff's February meeting with Garcia and her termination is probative of discriminatory animus, especially in combination with other changes in her employment conditions. After she returned from medical leave and informed Garcia of her bladder disease, Plaintiff's desk was moved and her duties were reassigned. Garcia asked Plaintiff to inform her whenever she would be away from her desk for reasons other than using the bathroom, though Plaintiff contends other employees were not

25

required to tell their supervisors about their whereabouts. Four days after informing Garcia of her bladder disease, Defendant terminated Plaintiff's employment.

While Defendant contends that the recommendation to terminate Plaintiff was made before she told them about her disability, the Agency provides no documentation of this decision, such as memoranda, emails or texts between the individuals involved in that decision. In this age of connectivity, this lack of contemporaneous documentation is unusual for such a serious matter. Moreover, the accounts of the supervisors differ. A reasonable jury could conclude that Plaintiff's request for accommodation became the deciding factor in her termination decision. While there is undisputed evidence that Plaintiff had performance deficiencies, particularly with respect to meeting her quota, a reasonable jury could conclude that Defendant, upon learning of Plaintiff's disability and/or request for bathroom accommodations, artificially inflated the severity of these deficiencies as pretext for firing her based on her disability. Therefore, Defendant's Motion for Summary Judgment is **DENIED** with respect to Plaintiff's disability discrimination claim.

## D. *Retaliation*

The Rehabilitation Act makes the ADA's anti-retaliation provision available to Federal employees, making it illegal to

26

"discriminate against any individual because such individual has

. . . exercised or enjoyed . . . any right granted or protected

by this chapter." 42 U.S.C. § 12203(a), (b); 29 U.S.C. § 794(d).

As with discrimination claims, retaliation claims follow the

McDonnell Douglas burden-shifting framework. Alvarado v. Donahoe,

687 F.3d 453, 458 (1st Cir. 2012).

To make out a prima facie retaliation claim, a plaintiff

must show that "(1) [she] engaged in protected conduct, (2) [she]

was subjected to an adverse action by the defendant, and (3)

there was a causal connection between the protected conduct and

the adverse action." Palmquist v. Shinseki, 689 F.3d 66, 70 (1st

Cir. 2012). Plaintiff has met her burden. A reasonable request

for disability accommodation constitutes a protected activity for

the purposes of the Rehabilitation Act. See Kelley v. Corr. Med.

Serv., Inc., 707 F.3d 108, 115 (1st Cir. 2013); Wright v.

CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003). Plaintiff

engaged in protected conduct when she met with Garcia in February

2009 and informed Garcia about her bladder condition and need for

frequent restroom breaks. Temporal proximity between a protected

activity and an adverse employment action, especially when so

close, can satisfy a plaintiff's prima facie showing of

causation. See Colon-Fontanez, 660 F.3d at 37; Calero-Cerezo, 355

F.3d at 25-26 (finding plaintiff established prima facie element

of causation where suspension came roughly one month after

27

engagement in protected activity). Here, causation is evident from the four-day proximity between Plaintiff's request for accommodations and her termination.

Because Defendant has proffered a legitimate, non-discriminatory reason for Plaintiff's termination, the Court asks whether a reasonable jury could find that Defendant's justification is a pretext for retaliation. A plaintiff may only obtain relief under the anti-retaliation provision of the Rehabilitation Act when retaliatory conduct is the but-for cause of an adverse employment action. <u>Palmquist</u>, 689 F.3d at 77. It is the plaintiff's burden to "show that the proffered reason is pretextual and that the job action was the result of the defendant's retaliatory animus." <u>Kelley</u>, 707 F.3d at 115. As stated above, the timing of Plaintiff's request for accommodation for the alleged disability and her termination is highly probative of retaliation, especially considered in combination with her supervisor's alleged attitude toward her frequent bathroom breaks and changes in her employment conditions after her return from medical leave. <u>Compare</u> <u>Carreras</u>, 596 F.3d at 37-38, <u>with</u> <u>Wright</u>, 352 F.3d at 478. A reasonable jury could determine that but for her request for accommodations, Plaintiff would not have been terminated, despite her track record of mediocre performance. Defendant's Motion for Summary Judgment is therefore **<u>DENIED</u>** with respect to Plaintiff's retaliation claim.

**E. Equal Pay Act**

The Equal Pay Act prohibits wage discrimination "between employees on the basis of sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). Plaintiff argues that Defendant violated the Equal Pay Act by paying her less than Carlos Linera, a male Partnership Specialist.

To prove a violation of the Equal Pay Act, a plaintiff must first make a prima facie showing "that the employer paid different wages to an employee of the opposite sex for substantially equal work." Ingram v. Brink's, Inc., 414 F.3d 222, 232 (1st Cir. 2005) (citing Corning Glass Works v. Brennan, 217 U.S. 188, 195 (1974)). The parties agree that Plaintiff has met her burden. Both Plaintiff and Linera applied for and were offered Partnership Specialist positions. Defendant paid Plaintiff at the GS-9 pay grade, but paid Linera at the GS-11 pay grade for substantially similar, if not identical, work. See Mullenix v. Forsyth Dental Infirmary for Children, 965 F. Supp. 120, 139 (D. Mass. 1996) (plaintiff may make out a prima facie showing by comparing herself to one male comparator).

The burden shifts to Defendant to establish that the wage discrepancy resulted from (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or

quality of production; or (4) a differential based on any other
factor other than sex. Corning Glass Works, 417 U.S. at 196
(citing 29 U.S.C. § 206(d)(1)). Defendant argues that the fourth
affirmative defense applies to this case.

"Acceptable factors 'other than sex' include experience,
prior salary, education, skills which the employer deems useful
to the position, and a proven ability to generate higher revenues
for the employer's business." Scott v. Sulzer Carbomedics, Inc.,
141 F. Supp. 2d 154, 176 (D. Mass. 2001). Factors used to
establish proper "other than sex" justifications are typically
factual and verifiable, as opposed to subjective. See id. at 176-
77 ("superior sales, market conditions, or prior work experience"
justify compensating similarly situated male employees more than
female plaintiff); Girdis v. E.E.O.C., 688 F. Supp. 40, 46 (D.
Mass. 1987), aff'd 851 F.2d 540 (1st Cir. 1988) (verifiable
"employment programs and practices" establish wage differential
other than sex).

The undisputed facts establish that both Plaintiff and
Linera served as Partnership Specialists. Applicants for the
Partnership Specialist position could apply to one or more pay
grades, based on his or her education and experience. Defendant
posted the Partnership Specialist application with the
instructions that applicants "must submit a complete application
for *each* grade level they wish to apply for," explicitly warning

that "[i]f only one application is received, you will considered
<u>only</u> for the lowest grade." (emphasis in original).

Plaintiff applied for the Partnership Specialist position at
the GS-9 pay grade only. She does not claim that she submitted
additional applications for other grade levels. Accordingly,
Defendant hired Plaintiff at the GS-9 pay grade. Linera applied
to the same position at the GS-11 level, and Defendant hired him
at that pay grade. Plaintiff's qualifications may have justified
a GS-11 salary, but Defendant's job posting makes clear that if
an individual submits only one completed application, that
individual will be considered only for that one pay grade level.
Plaintiff does not assert that she was denied an opportunity to
apply to the Partnership Specialist position at a higher pay
grade than the GS-9 level, or that she was advised to apply only
to that job. Further, Defendant presents evidence showing that at
least one female Partnership Specialist was hired at the GS-11
pay grade.

Defendant's employment practice of hiring and compensating
individuals based on the job grade he or she applies for
constitutes a legitimate factor independent of sex. <u>Cf.</u> <u>Girdis</u>,
688 F. Supp. at 46-48 (holding that "time in grade" compensation
restriction against female plaintiffs constitutes factor other
than sex; "if the plaintiffs had been males, they still would
have been restricted to the [lower pay grade]"). Accordingly,

31

Defendant's Motion for Summary Judgment is **ALLOWED** with respect to Plaintiff's Equal Pay Act claim.

### IV. ORDER

After a review of the record and hearing, the Court **ALLOWS IN PART and DENIES IN PART** Defendant's Motion for Summary Judgment (Docket No. 23) as follows:

- Count I:      Summary judgment **DENIED.**

- Count II:     Summary judgment **ALLOWED.**

- Count III:    Summary judgment **ALLOWED.**

- Count IV:     Summary judgment **DENIED.**


  /s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge